UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

```
-----------------------------------X
UNITED STATES OF AMERICA          :
                                  :
          v.                      :      NO. 3:06CR282 (EBB)
                                  :
ALAN ZALESKI,                     :
                                  :
          Defendant.              :
-----------------------------------X
```

<u>AMENDED RULING ON DEFENDANT'S MOTIONS TO SUPPRESS</u>

Defendant Alan Zaleski has moved to suppress physical evidence seized from his home, claiming that this evidence was seized in violation of the Fourth Amendment, and to suppress statements he made after he was arrested, claiming that these statements were taken in violation of <u>Arizona v. Miranda</u>, 384 U.S. 436 (1966)  For the following reasons, the motions [Doc. Nos. 24 & 25] are DENIED.

<u>FINDINGS OF FACT</u>

On the afternoon of August 9, 2006, a contractor working as a tree-cutter for a utilities company called the Berlin Police Department to report that he had discovered what he described as "trip wires" in the driveway leading from the road to the residence at 863 Shuttle Meadow Avenue. Tr. 4/25/07 at 76. Officers arrived at that address and were told by the tree-cutter that he had encountered a similar device on the property on a previous occasion when he triggered a trip wire causing an explosion. <u>Id.</u> at 143. He told the officers that the explosion had caused hearing loss and had knocked him off his feet, though apparently he did not report

1

the incident at the time.  Id. at 143; Tr. 9/27/07 at 260.  The officers were able to see at least one - and possibly a second - trip wire with binoculars, but, because the wires were located some distance up the driveway, they were not visible to the naked eye. Tr. 4/25/07 at 141, 148.  At least one additional device, which turned out to be an infrared motion sensor, was also visible from the head of the driveway.  Tr. 9/27/07 at 266-67; Tr. 10/11/07 at 48.

Officers from the New Britain Police Department, a New Haven Police officer assigned to the FBI Joint Terrorism Task Force, bomb technicians from the Connecticut State Police Emergency Services Unit, and fire and ambulance personnel soon converged on the scene. Tr. 4/25/07 at 84-85, 152-55; Tr. 9/27/07 at 6, 9, 258-59.  Because the police were concerned about a possible dangerous condition on the property, they set up traffic posts a short distance from the property in both directions on Shuttle Meadow Avenue.  Tr. 4/25/07 at 85-86.  The police and emergency personnel did not enter the property at this point.  Id. at 162; Tr. 10/11/07 at 26.  After canvassing neighbors, the officers learned that the house on the property was inhabited by a man named "Alan" whose last name began with "Z" and ended in "ski," and that this person drove a blue Chevrolet pick-up truck  Tr. 4/25/07 at 12, 38, 158.  At approximately 3:45 p.m., defendant Alan Zaleski, who was driving a truck matching that description, arrived at one of the traffic

posts and told a police officer that he lived at 863 Shuttle Meadow Avenue.  Tr.  10/30/07 at 13-14.

Zaleski had been out of his house for most of the day.  Tr. 10/31/2007 at 9.  He had been cutting lawns and, because he was tired, decided to drive home around 3 p.m.  Id. at 10.  He was accompanied by his dog Scrappy.  Id.  He stopped on his way home to buy a jug of cider, some of which he drank.  Id. at 10, 69.  When Zaleski arrived at the traffic post, he was told that he could not continue on to his house.  Tr. 4/25/07 at 15; Tr. 10/30/07 at 12. A police officer took his driver's license and summoned Officer Michael Manning, the Berlin Police Officer who had taken charge of the situation.  Tr. 4/25/07 at 45.  Zaleski's driver's licence was not returned to him at any point that day.  Id. at 45, 201.

What happened next is disputed.  The government's version of events is as follows.  Officer Manning testified that he asked Zaleski about the trip wires and that Zaleski said that he would be willing to speak to the bomb technicians about them.  Tr. 4/25/2007 at 93.  Zaleski then agreed to drive with Manning to the head of the driveway, where the bomb technicians were located.  Id. at 94. Zaleski rode in the back seat of Manning's police car and left his dog and truck with the police at the traffic post.  Id. at 94-95. During the short trip to the head of the driveway, Zaleski continued to discuss the trip wires with Manning.  Id.  Zaleski explained that the wires were connected to mousetraps in such a

manner that, when the wire was tripped, the bale of the mousetrap would strike a percussion cap causing a loud noise.  Id. at 95. Zaleski set up these trip wires to function as a kind of burglar alarm to protect his property.  Tr. 10/31/2007 at 28-29.  Zaleski volunteered to help the bomb technicians dismantle the devices. Tr. 4/25/07 at 96; Tr. 10/11/07 at 48.  He also told Manning that he had additional percussion caps in his truck and agreed to allow officers to search the truck.  Tr. 4/25/07 at 96.  Manning conferred briefly with Trooper Pablo Arroyo and Officer Ray Crowley, the bomb technicians, at the head of the driveway, and then he returned to the traffic post with Zaleski in his car.  Tr. 4/25/07 at 96-97.  Arroyo and Crowley traveled to the traffic post in a separate vehicle.  Tr. 9/27/07 at 268.  Upon arrival at the traffic post, Manning let Zaleski out of the car, and Zaleski signed a consent form allowing the police to search his truck. 4/25/07 at 98; Gov. Ex. 2.  The officers then searched the truck, which had been moved while Zaleski and Manning were at the head of the driveway.  Tr. 4/25/07 at 55-57.

Zaleski, however, testified that a different version of events led up to his giving consent to search the truck.  He testified that when he initially arrived at the traffic post on his way home, a police officer told him he was not to leave.  Tr. 10/31/07 at 14-15.  He testified that the officer ordered him out of his truck and that, in response to the officer's demands, he removed his cell

phone and utility knife and left them on a box in the back of his truck. Id. at 15-16. According to Zaleski, the officers told him that they were interested in "something going on" at his property. Id. at 17. Zaleski testified that Manning then placed him in a police car, but he denied that he drove to the head of the driveway with Manning. Id. at 18, 82. Rather, he testified that Manning left him in the stationary police car for 20 minutes and that it got "really hot" because the windows were rolled up and the air conditioning did not cool the back seat. Id. at 18-19. Zaleski, a former Army Medic, testified that he began to feel the symptoms of heatstroke. Id. at 20. He testified that he began to pound on the windows of the police car and screamed at the officers standing outside, and that these officers either ignored him or smirked at him. Id. at 20-21. Zaleski apparently was unable to speak to anyone until Manning finally returned, apologized, and offered to roll down the windows. Id. at 23. Zaleski claims Manning then told him that he would let Zaleski have some water if he agreed to allow the police to search his truck. Id. at 23-24. According to Zaleski, he then agreed to allow them to search the truck because he needed water and was suffering to such a degree that it would have been appropriate to use intravenous fluids. Id. However, he also testified that he allowed the officers to search his truck because he "really had nothing to hide" since it is legal to possess percussion caps. Id. at 31, 77. Zaleski denied having

signed a consent form and testified that the signature on the consent form was not his.  Id. at 25-26.

For a number of reasons, the Court finds the government witness' testimony about the sequence of events prior to the search of the truck to be more credible than Zaleski's version.  Zaleski seemed unable to recount the sequence of events precisely.  It was clear from his testimony that the officers were looking for percussion caps when they searched the truck.  It is therefore apparent that Zaleski and the officers had a discussion about percussion caps and trip wires before the officers decided to search the truck.  In this regard, it is telling that Manning's version of events includes a conversation with Zaleski about percussion caps prior to the officers' decision to search the truck.  However, in the account initially offered by Zaleski during his direct examination, there is no indication that Zaleski had any such conversation before Manning informed him that the officers wanted to search the truck.  See Tr. 10/31/07 at 13-22.  Instead, Zaleski's initial recounting of events suggested that the officers did not fully explain why they were interested in him or his property before he learned of their desire to search the truck.  See, e.g., id. at 13, 17.  Later in his testimony, after being prompted by his lawyer, Zaleski agreed that such a conversation had taken place, but he seemed unable to clarify exactly when it occurred.  See id. at 28-29, 75-77.  Nor did he clarify how this

conversation fit into his first account, which did not leave room for such an exchange.

The account Zaleski gave on the stand was inconsistent in other ways too. For example, at one point, Zaleski testified that his reaction to the hot weather was exacerbated by the fact that he had had nothing to eat or drink all day except for a cup of coffee in the morning. Id. at 68. However, he also testified that he had been drinking from a newly purchased jug of cider only minutes before arriving at the traffic post. Id. at 10, 69. Such a demonstrated willingness to exaggerate is an additional reason to doubt Zaleski's credibility.

Furthermore, Manning's account of his interactions with Zaleski was corroborated in large part by the testimony of Officer Brian Solek of the New Britain Police Department, Officer Crowley of the New Haven Police Department and Trooper Arroyo of the Connecticut State Police. In order to credit Zaleski's testimony, the Court would, in effect, have to find that four police officers from different agencies conspired to testify falsely about a large number of details. The Court does not find this to have been the case. The Court does not, for example, credit Zaleski's self-serving testimony that he did not sign a form consenting to the search of his truck. This event was observed by three of the witnesses who testified at the hearing. Tr. 4/25/07 at 103; Tr. 9/27/07 at 24-25, 271.

The Court does not credit Zaleski's testimony that he consented to the searches because his will was overborne by the heat and the officers' allegedly coercive tactics; nor does the Court believe that he consented to a search because he was "dying" and thought he needed water. <u>See</u> Tr. 10/31/07 at 20-21, 85. None of the government witnesses observed that Zaleski was suffering from the heat or heard him complain about possible heatstroke. Tr. 4/25/07 at 106; Tr. 9/27/07 at 32-33, 42, 293-94; Tr. 10/11/07 at 185-86. While it is true that it was a warm summer day, and the officers did testify that they gave Zaleski a jug of water from his truck, Zaleski told them that the water was for his dog. Tr. 4/25/07 at 106-7; Tr. 9/27/07 at 33-34.

During the search of the truck, Zaleski sat by the side of the road in a shaded area with his dog. Tr. 4/25/07 at 106; Tr. 9/27/07 at 33. When he observed that the officers were unable to find the percussion caps in the truck, he told the officers where to look. Tr. 10/31/07 at 31. In addition to the percussion caps, the officers found, among a collection of plumbing supplies in the truck, some lengths of pipe and matching end caps. Tr. 9/27/07 at 25. The bomb technicians believed that these items could, in conjunction with the percussion caps, be used as components of a "pipe bomb." <u>Id.</u> at 28.

Arroyo, Crowley and Manning then asked Zaleski if they could search his house and the area around his house. Tr. 4/25/07 at

107.  They explained that they were concerned about the threat to public safety presented by the devices he had rigged up.  Id.  In particular, the bomb technicians were concerned about the infrared devices that sent a signal into the house, and, as a result, they wanted to search the house for explosives.  Tr. 9/27/07 at 281. Zaleski was hesitant to consent to this search and indicated that he wished to speak to a lawyer.  Tr. 4/25/07 at 108; 10/30/07 at 31.  In response, Officer Crowley gave Zaleski a cell phone, and, when the phone's battery died shortly thereafter, Trooper Arroyo gave Zaleski a second phone.  Tr. 9/27/07 at 34-37.  Zaleski was unable to reach an attorney.  Tr. 10/37/07 at 35.

The officers then told Zaleski that they needed to disassemble the trip wires he had set up on his property and asked him to drive to the head of the driveway with them.  Tr. 9/27/07 at 279. Zaleski drove his own truck while police vehicles drove in front of him and behind him.  Tr. 4/25/07 at 112.  Upon arrival at the head of the driveway, Arroyo, Crowley and Manning again explained that they wished to search the house for explosives.  Tr. 9/27/07 at 281.  Zaleski told the officers that he was concerned about the fact that he had an unregistered firearm in the house.  Id. Trooper Arroyo assured Zaleski that the officers were interested only in any explosives that might be in the house and that, in Connecticut, it is not illegal to possess an unregistered firearm in one's home.  Id. at 43, 281.  Zaleski then signed a form

consenting to a search of his house. Id. at 283; Gov. Ex. B. Again, in testimony the Court does not credit, Zaleski claimed that he never signed this form. Tr. 10/31/07 at 42-43.

Zaleski, Arroyo, Crowley and other officers proceeded on foot up the driveway toward the house. Tr. 9/27/07 at 45-46. On the way to the house, Zaleski pointed out the trip wires and the infrared sensors he had set up and explained how these devices operated. Id. at 47. When the group reached the house, Zaleski unlocked the door, allowing the officers to enter. Id. at 50. The officers immediately noticed a machine gun mounted on a tripod facing out the window of the house. Id. at 51. Zaleski, a gun collector, told them that the machine gun was a novelty item. Id. at 288. During a brief search conducted with Zaleski's assistance, the officers found body armor, grenades and a number of guns and silencers. Id. at 288-89, 292. The officers then decided to suspend the search until they had obtained a search warrant. Id. at 57.

Back at the head of the driveway, Officer Manning placed Zaleski in handcuffs and told him he was under arrest. Tr. 10/31/07 at 46. The officers later obtained a search warrant, searched the house and surrounding property, and uncovered the array of guns, ammunition, grenades, military equipment, documents, and assorted other physical evidence that Zaleski seeks to suppress.

Zaleski was interviewed at the Berlin Police Department later that evening. Tr. 10/11/07 at 160. At the beginning of the interview, Berlin Police Detective Anne-Marie Haas and FBI Agent Anderson advised Zaleski of his rights. Id. at 156. Zaleski signed a standard "Notice of Rights" form, indicating that he had been advised of his rights. Gov. Ex. 8. The officers asked Zaleski if he would like to try to contact a lawyer again and offered him a phone book so that he could find a lawyer. Id. at 156-57. Zaleski declined the offer, waived his rights, and agreed to speak to the officers. Id. at 157-59. Zaleski then made the statements he now seeks to suppress.

DISCUSSION

I.   MOTION TO SUPPRESS PHYSICAL EVIDENCE

A.   Legal Standard

The Fourth Amendment protects "against unreasonable searches and seizures." "It is basic Fourth Amendment jurisprudence that when the Government seeks to intrude upon an individual's legitimate expectations of privacy, it must either obtain a warrant from a neutral magistrate or bring its search within one of the few 'jealously and carefully drawn' exceptions to the warrant requirement." United States v. Buettner-Janusch, 646 F.2d 759, 764 (2d Cir. 1981) (quoting Jones v. United States, 357 U.S. 493, 499 (1958)), cert. denied, 454 U.S. 830 (1981); see also Katz v. United States, 389 U.S. 347, 357 (1967). "One of the specifically

established exceptions to the requirements of both a warrant and probable cause is a search that is conducted pursuant to consent." Schneckloth v. Bustamonte, 412 U.S. 218, 219 (1973). Such consent must be "freely and voluntarily given," id. at 222, and not "a mere acquiescence in a show of authority," United States v. Wilson, 11 F.3d 346, 351 (2d Cir. 1993).

"[T]he question whether a consent to a search was in fact 'voluntary' or was the product of duress or coercion, express or implied, is a question of fact to be determined from the totality of all the circumstances." Schneckloth, 412 U.S. at 226. In applying the "totality of the circumstances" test, the Supreme Court has "consistently eschewed bright-line rules, instead emphasizing the fact-specific nature of the reasonableness inquiry." Ohio v. Robinette, 519 U.S. 33, 34 (1996). In assessing voluntariness, the Court does not apply an objective standard; rather, "[t]he very object of the inquiry [is] the nature of a person's subjective understanding." Scheneckloth, 412 U.S. at 230. Factors the court should consider in assessing the voluntariness of a consent include the defendant's age, intelligence and educational background, the length and nature of his or her interaction with the police, and whether the officers engaged in coercive behavior. United States v. Jones, 154 F. Supp. 2d 617, 621 (S.D.N.Y. 2001) (citing Scheneckloth, 412 U.S. at 226-27). The prosecution bears the burden of showing, by a preponderance of the evidence, that

consent to search was freely and voluntarily given. Buettner-Janusch, 646 F.2d 759, 764 (citing Schneckloth, 412 U.S. at 222).

B.   Zaleski's Consent to the Searches of his Vehicle and Home

It not disputed that Zaleski consented to the search of his truck and his house. He signed consent forms for each search, and he admitted on the stand that he had consented orally to allow the officers to conduct both searches. Tr. 10/31/2007 at 24, 42. The issue before the Court is whether his consent was freely and voluntarily given. Zaleski argues that his consent to search his truck and house was not voluntarily given and, he argues, the evidence uncovered during all subsequent searches, including the searches made pursuant to a warrant, must therefore be suppressed as "fruits of the poisonous tree." See Wong Sun v. United States, 371 U.S. 471, 485 (1963)

The Court does not credit Zaleski's testimony that he was confined by himself in the back of a stationary police car and that he began to suffer from heatstroke. The Court also finds Zaleski's claims that he needed intravenous fluids and that he was afraid he would suffer the same fate as Randy Weaver to be, at best, exaggerations. See Def.'s Post-Hr'g Mem. in Supp. at 11-12. Nor does the Court believe that Zaleski was told he would only be allowed to drink water if he consented to a search. Bearing these findings of fact in mind, the Court is not persuaded by Zaleski's

claims that he was coerced by the police into giving consent by coercive tactics that involved trading water for consent to search.

The Court next addresses Zaleski's argument that the custodial nature of the circumstances in which he gave consent weighs against a finding that he gave his consent voluntarily. While "the fact that a defendant is in custody does not alone vitiate his consent to a search ..., consent to search obtained from a person in custody does 'require more careful scrutiny.'" United States v. Puglisi, 790 F.2d 240, 243 (2d Cir. 1986) (quoting United States v. Wiener, 534 F.2d 15, 17 (2d Cir. 1976), and citing United States v. Watson, 423 U.S. 411, 424-25 (1976)); see also United States v. Mapp, 476 F.2d 67, 78 (2d Cir. 973) (noting the "relationship between custody, coercion and consent").

Zaleski was stopped at a traffic post and informed that he could not continue on to his house. A police officer demanded his driver's license and did not return it to him. Zaleski was confronted by a number of uniformed police officers and police cars that surrounded him and the entrance to his property. For the short period of time it took to drive to the head of the driveway and back to the traffic post, he was placed in the back of a police car; while the evidence shows that Zaleski voluntarily agreed to go with Manning to speak to the bomb technicians, it is nonetheless true that he could not exit the police car because the doors did not open from the inside. While Zaleski was driving with Manning

14

to the head of the driveway, the police moved his truck, apparently without his consent. All these factors support Zaleski's contention that he had been seized within the meaning of the Fourth Amendment when he consented to the search. A "reasonable person" in Zaleski's position might well "have believed he was not free to leave." See United States v. Mendenhall, 446 U.S. 544, 554 (1980); see also Florida v. Bostick, 501 U.S. 429, 433 (1991) (noting that an encounter is consensual where "a reasonable person would feel free 'to disregard the police and go about his business'") (quoting California v. Hodari D., 499 U.S. 621, 628 (1991)).

However, the record does not support the notion that Zaleski's seizure by the police rendered his consent involuntary. Zaleski was not handcuffed prior to giving consent. The police officers did not draw their guns; nor did they make any threats or use physical force. Zaleski was allowed to walk around more or less freely when he was not in the police car. Prior to giving his consent, Zaleski's encounter with the police had been relatively brief. He gave his consent in a public place rather than at a police station. Furthermore, before consenting to the search of his house - where the vast majority of the physical evidence was found - Zaleski was allowed to drive his own truck. All of these factors suggest that, even if Zaleski had been seized within the meaning of the Fourth Amendment, the circumstances in which he was seized were not sufficiently coercive to have caused him to give

his consent involuntarily.

Courts have held that defendants voluntarily consented to searches in custodial situations that were considerably more coercive in nature. See, e.g., United States v. Ceballos, 812 F.2d 42, 51 (2d Cir. 1987) (holding that defendant voluntarily consented despite having been taken in handcuffs to a Secret Service field office and questioned for "a couple of hours"); United States v. Arango-Correa, 851 F.2d 54, 57 (2d Cir. 1988) (holding that consent to search was voluntary even though defendant had been held in custody for five hours, strip-searched and interrogated); United States v. Hidalgo, 7 F.3d 1566, 1571 (11th Cir. 1993) (holding that consent was voluntary where the defendant was "arrested by SWAT team members who broke into his home in the early morning, woke him, and forced him to the ground at gunpoint"); United States v. Duran, 957 F.2d 499 (7th Cir. 1992) (holding that consent was voluntarily given by an emotionally distressed suspect during post-arrest interrogation in a police station).

The evidence is inconsistent with Zaleski's claims that his consent was given "under clear duress" and that he was "badgered continuously" by the police. See Def.'s Post-Hr'g Mem. in Supp. at 12. Instead, testimony given at the suppression hearing indicates that consent to search was given in "an atmosphere of relative calm ... conducive to the making of a knowing and intelligent decision." See Mapp, 476 F.2d at 78. Detective Haas, who arrived at the

traffic post while Zaleski was attempting to call a lawyer, at first thought that Zaleski was another "law enforcement guy," rather than the subject of investigation, because of the way Zaleski was standing by himself and talking on the phone. Tr. 10/11/2007 at 136. Furthermore, rather than having acted under duress, Zaleski seems to have been willing to cooperate with the police in many respects: he volunteered information about the trip wires and the percussion caps; he volunteered to disassemble the devices; and he agreed to allow the police to search his vehicle at least in part because he thought he had nothing to hide.

An additional fact weighing in favor of finding that the consent was voluntary is that Zaleski knew he could refuse to consent. Both of the consent forms he signed indicated that he was aware of his constitutional right to withhold consent. See United States v. Vasquez Santiago, 602 F.2d 1069, 1073 (2d Cir. 1979) (holding that consent was voluntarily given when suspect "was not threatened, was in a public area ..., and was informed that he had the option of refusing consent to the search").

The Court finds that Zaleski's consent was neither the result of coercion nor "a mere acquiescence in a show of authority." See Wilson, 11 F.3d at 351. Considering the totality of the circumstances, the Court therefore finds that the government has met its burden of establishing that Zaleski freely and voluntarily gave his consent to search his vehicle and his house.

The Court also rejects Zaleski's argument that suppression is warranted on the ground that his consent was obtained after he had invoked his right to counsel.  First, the Court notes that Zaleski could not have invoked his Sixth Amendment right to counsel prior to the search of his truck because that right attaches only upon the initiation of adversary judicial proceedings.  <u>See</u> <u>United States v. Gouveia</u>, 467 U.S. 180, 187 (1984).  Second, even assuming *arguendo* that Zaleski invoked his Fifth Amendment right to counsel before consenting to a search of his home,[1] this fact would not establish a violation of the Fifth Amendment since a request for consent to search does not constitute interrogation within the meaning of <u>Miranda</u>.  <u>See</u> <u>United States v. McClellan</u>, 165 F.3d 535, 544 (7th Cir. 1999); <u>see also</u> <u>United States v. Rodriguez-Garcia</u>, 983 F.2d 1563, 1568 (10th Cir. 1993) (noting that "[e]very federal circuit court which has addressed ... the issue ... has reached the conclusion that a consent to search is not an incriminating statement") (citations omitted).

II.  <u>MOTION TO SUPPRESS STATEMENTS</u>

The Supreme Court, in <u>Edwards v. Arizona</u>, 451 U.S. 477, 485-86 (1981), held that "an accused ..., having expressed his desire to deal with the police only through counsel, is not subject to further interrogation by the authorities until counsel has been

---

[1] In the discussion of Zaleski's motion to suppress statements, the Court rejects Zaleski's contention that he invoked his Fifth Amendment right to counsel at this point.

made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police." Statements obtained after law enforcement officials re-initiate interrogation in violation of the rule established in Edwards will be suppressed as violations of Arizona v. Miranda, 384 U.S. 436 (1966). When a defendant alleges that a statement was obtained in violation of Miranda, the government bears the burden of proving, by a preponderance of the evidence, that police questioning was conducted in compliance with Miranda, that Miranda does not apply because the statement was not obtained during custodial interrogation, or that the statement falls into an exception to Miranda. United States v. Miller, 382 F. Supp. 2d 350, 362 (N.D.N.Y. 2005) (citing Lego v. Twomey, 404 U.S. 477, 489, and United States v. Anderson, 929 F.2d 96, 98 (2d Cir. 1991)).

Zaleski argues that he initially invoked his right to counsel when he told Manning, Arroyo and Crowley that he wished to speak to a lawyer before consenting to a search of his house. He argues that he was unlawfully subjected to further interrogation by Detective Haas and Agent Anderson at the Berlin Police Department. He argues that the statements he made to Haas and Anderson must therefore be suppressed. The Court rejects Zaleski's argument for two reasons.

First, Zaleski could not, under the circumstances of his encounter with the officers at the traffic post, have invoked his

Fifth Amendment right to counsel. <u>Miranda</u> rights cannot be asserted outside the context of custodial interrogation. <u>United States v. Vega-Figueroa</u>, 234 F.3d 744, 749 (1st Cir. 2000) (holding that "[i]n order for <u>Miranda</u> rights to be invoked, there must be (1) custody and (2) interrogation"); <u>Burket v. Angelone</u>, 208 F.3d 172, 197 (4th Cir. 2000), <u>cert. denied</u>, 530 U.S. 1283 (2000). An individual cannot, therefore, assert his or her <u>Miranda</u> right to counsel before he or she is in custody. <u>United States v. Wyatt</u>, 179 F.3d 532, 537 (7th Cir. 1999); <u>see also</u> <u>McNeil v. Wisconsin</u>, 501 U.S. 171, 182 n. 3 (1991) ("We have in fact never held that a person can invoke his <u>Miranda</u> rights anticipatorily, in a context other than 'custodial interrogation.'")

The test for determining whether a suspect is in custody during questioning by police is whether "a reasonable [person] in the suspect's position would have understood his situation ... as the functional equivalent of formal arrest." <u>Berkemer v. McCarty</u>, 468 U.S. 420, 442 (1984); <u>see also</u> <u>United States v. Newton</u>, 369 F.3d 659, 670-72 (2d Cir. 2004) ("[<u>Miranda</u>] instructs [officers] to administer warnings whenever they place a person under formal arrest or apply restraints generally understood as comparable to those of a formal arrest.") As noted in the preceding discussion about Zaleski's voluntarily given consent to the searches of his house and truck, he may have been seized within the meaning of the Fourth Amendment at the point at which he indicated that he would

like to speak to a lawyer. However, it does not necessarily follow, from the Court's finding that a reasonable person in Zaleski's position might not have felt free to leave, that Zaleski was subjected to the functional equivalent of formal arrest. Because "not every seizure constitutes custody for purposes of Miranda, additional analysis is required" to determine whether Zaleski was in custody for Miranda purposes. See Newton, 369 F.3d at 672; see also Berkemer v. McCarty, 468 U.S. at 439-42 (holding that seizures of brief duration with limited questioning, such as Terry-stops, do not constitute custody under Miranda); United States v. Ali, 68 F.3d 1468, 1473 (2d Cir. 1995).

The evidence shows that Zaleski was not subject either to a formal arrest or its functional equivalent when he indicated that he wished to speak to a lawyer. Importantly, Zaleski was not handcuffed. See Newton, 369 F.3d at 675 (citing cases and noting that "[h]andcuffs are generally recognized as a hallmark of a formal arrest"). With the possible exception of the brief period of time he voluntarily spent in Manning's car, Zaleski was not physically restrained; in fact, prior to stating that he wished to speak to a lawyer, Zaleski had been sitting by the side of the road with this dog. In addition, it is significant that the interaction took place on the road only a short distance from Zaleski's house. Courts are generally more likely to find interrogation to be non-custodial when it takes place in familiar

surroundings, or in public, rather than at a police station. United States. v. Mitchell, 966 F.2d 92, 99 (2d Cir. 1992); United States v. Penalo, 516 F. Supp. 1042, 1048-49 (E.D.N.Y. 1981); United States v. Rakowski, 714 F. Supp. 1324, 1333 (D. Vt. 1987) (finding that suspect was not in custody for Miranda purposes during a search of his house after police stopped suspect near his house, drove him to his home so that he would be present as they executed a search warrant, told him he was not under arrest, allowed him to call his lawyer, and encouraged him to cooperate with their search).

Furthermore, after the police stopped Zaleski at the traffic post, his interactions with officers were largely consensual. Prior to indicating that he wished to speak to a lawyer, Zaleski agreed to accompany Manning during the initial trip to the head of the driveway, and he expressly consented to a search of his car. The initial seizure of Zaleski at the traffic post was therefore prolonged, for the most part, by Zaleski's consensual interactions with the officers. An investigative stop is not elevated to a full custodial arrest simply because a suspect voluntarily consents to a search or to continued interrogation. See, e.g., California v. Beheler, 463 U.S. 1121 (1983) (holding that interrogation at police station was non-custodial, and Miranda was therefore inapplicable, where suspect voluntarily accompanied police officers to the station); United States v. Cota, 953 F.2d 753 (2d Cir. 1992)

(holding that interrogation at police station was non-custodial after police stopped suspect's car, ordered her out of the car at gunpoint, briefly handcuffed her, told her that her car had been seized but that she was free to leave, and asked her to voluntarily accompany them to the police station); Wyatt, 179 F.3d at 536-37 (holding that a suspect was not in custody for Miranda purposes when he was interrogated and patted down in the parking lot of a bar after voluntarily leaving the bar with the police).

Because Zaleski was not in custody when he told the officers that he wished to speak to a lawyer, he did not invoke his Miranda rights, and the officers did not violate Edwards when they interrogated him at the police station later in the day.

Second, even assuming *arguendo* that Zaleski was in custody when he told the officers that he would like to consult a lawyer, the Court would find that he did not, in fact, invoke the right to counsel guaranteed by Miranda. "The applicability of the '"rigid" prophylactic rule' of Edwards requires courts to 'determine whether the accused *actually invoked* his right to counsel.'" Davis v. United States, 512 U.S. 452, 458 (1994) (alteration in original) (quoting Smith v. Illinois, 469 U.S. 91, 95 (1984) (quoting Fare v. Michael C., 442 U.S. 707, 719 (1979))). Moreover, Edwards applies only where the Court finds that a suspect has invoked his or her Fifth Amendment right to counsel, as opposed to some other right to counsel. See McNeil v. Wisconsin, 501 U.S. 171, 178-79 (1991).

(holding that a defendant who had invoked his Sixth Amendment right to counsel did not automatically also invoke his Fifth Amendment right to counsel and, therefore, that Edwards was inapplicable). The Fifth Amendment is invoked – and the rule of Edwards applies – only "when an accused has invoked his right *to have counsel present during custodial interrogation*." See Edwards, 451 U.S. at 484 (emphasis added). In other words, Edwards only bars further interrogation when a suspect has expressed the "wish for the particular sort of lawyerly assistance that is the subject of Miranda." McNeil, 501 U.S. at 178 (1991).

"To avoid difficulties of proof and to provide guidance to officers conducting interrogations," the assessment of whether a suspect has invoked his or her Miranda right to counsel "is an objective inquiry." Davis, 512 U.S. at 458-59 (citing Connecticut v. Barrett, 479 U.S. 523, 529 (1987)). "The test to determine if the Fifth Amendment has in fact been invoked – and thus that Edwards applies – is whether the defendant made 'some statement that can reasonably be construed to be an expression of a desire for the assistance of an attorney *in dealing with custodial interrogation by police*." United States v. Bin Laden, 160 F. Supp. 2d 670, 680 (S.D.N.Y. 2001) (quoting McNeil, 501 U.S. at 178 (emphasis in original)). While a "suspect need not 'speak with the discrimination of an Oxford don,'" a suspect's invocation of his or her Miranda right to counsel must be "[un]ambiguous" and

"[un]equivocal." <u>Davis</u>, 512 U.S. at 459.

In <u>United States v. LaGrone</u>, 43 F3d 332, 333 (7th Cir. 1994), the Seventh Circuit considered a similar scenario in which police officers, after raiding the defendant's place of business and briefly interrogating him, asked the defendant to consent to a search. Before consenting to the search, the defendant unsuccessfully tried to contact his lawyer. <u>Id.</u> The defendant was then taken to a police station where the officers <u>Mirandized</u> him and interrogated him again. <u>Id.</u> Finding that "it [was] clear from the context of the situation that [the defendant] wanted to consult with his attorney about whether to consent to a search of his market," and reasoning that this request did not implicate the "particular sort of lawyerly assistance that is the subject of <u>Miranda</u>," the court held that the defendant had not invoked his Fifth Amendment right to counsel and rejected his argument that the statements he made at the police station were taken in violation of <u>Edwards</u>. <u>Id.</u> at 337.

The Court is not persuaded by Zaleski's arguments that <u>LaGrone</u> is factually distinguishable. To the contrary, the reasoning in <u>LaGrone</u> is clearly applicable to the facts of this case. It is clear from the testimony given at the suppression hearing that Zaleski's statement that he wished to speak to a lawyer was made only in connection with the officers' request for consent to search his house. He had apparently been conversing with the officers

relatively freely up until that point and continued to converse with them for some time afterwards. Even in the evening, at the Berlin Police Department, when Zaleski was given an opportunity to contact a lawyer to assist him with his interrogation, he declined the offer. At no point during the day did Zaleski indicate to the police that he wished to speak to a lawyer in order to assist him in answering their questions. At the traffic post, Zaleski indicated his desire to speak to a lawyer only after Arroyo, Crowley and Manning asked for his consent to search in and around his house. Zaleski himself gave the following testimony regarding the statement that he made at the traffic post:

Q: How important was it for you to reach a lawyer?

A: I wanted some advice on what to do. These guys were pretty much, I mean – I wasn't free to go. I mean, they weren't going to let me go. They wanted to search my house ...

Tr. 10/31/07 at 32. The Court can only conclude from this testimony that Zaleski was interested in speaking with a lawyer for the purpose of getting advice on whether he should consent to a search of his house. There is no evidence that he said or did anything to indicate that his interest in speaking with a lawyer extended beyond this purpose.

Zaleski's expression of his wish to consult an attorney could not therefore have been reasonably construed to be a request for a lawyer to assist with his interrogation. The Court finds that Zaleski did not invoke his Fifth Amendment right to counsel prior

to waiving his rights during his interrogation at the Berlin Police Department.

CONCLUSION

For the foregoing reasons the defendant's motions to suppress [Doc. Nos. 24 & 25] are DENIED.

SO ORDERED.

_____/s/_____
ELLEN BREE BURNS
SENIOR U.S. DISTRICT JUDGE

Dated at New Haven, Connecticut this 1st day of April, 2008.